**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DGI-BNSF CORP., <br><br> Plaintiff, <br><br> v. <br><br> TRT LEASECO, LLC, <br><br> Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     Civil Action No. 18-cv-3252 |

**COMPLAINT**

Plaintiff DGI-BNSF Corp. ("DGI") as and for its Complaint against defendant TRT LeaseCo, LLC ("TRT LeaseCo"), alleges as follows:

**Statement of the Case**

1.      DGI brings this action to enforce its right to receive significant quarterly payments from TRT LeaseCo under a Management Services Agreement dated July 14, 2016 (the "MSA"). TRT LeaseCo owns railroad facilities that it leases to BNSF Railway Company (f/k/a The Burlington Northern and Santa Fe Railway Company) ("BNSF"), through at least 2034. The MSA expressly entitles DGI to "Services Fees for Asset Management Services" with respect to certain defined transactions, which "shall be payable on a periodic basis (but not less than quarterly) following the closing of such" transactions. Despite closing a qualified transaction, TRT LeaseCo has failed to make any of the requisite "not less than quarterly" payments to DGI.

2.      TRT LeaseCo's failure to pay Services Fees for Asset Management Services arises from the improper domination and control of TRT LeaseCo by its ultimate controller, Kingsway Financial Services, Inc. ("KFS"), a publicly traded company largely involved in the insurance industry and certain merchant banking services. The MSA was an exhibit to a Stock

Purchase Agreement dated May 17, 2016 (the "SPA"). Under the SPA, CMC Acquisition, LLC ("CMC Acquisition"), as an indirect wholly-owned subsidiary of KFS, acquired from CRIC TRT Acquisition, LLC ("CRIC"), as an affiliate of DGI, an 81% equity interest in CMC Industries, Inc. ("CMC Industries"), a holding company that in turn wholly-owns TRT LeaseCo through an intermediate entity. The enterprise value of the transaction exceeded $180 million.

3.     The express right to payment of "not less than quarterly" fees to DGI induced DGI and its affiliate CRIC into the MSA and the contemporaneous sale by CRIC of the 81% equity interest in CMC Industries to KFS's subsidiary.

4.     As a result of the transaction, TRT LeaseCo is now dominated and controlled by KFS. KFS and its affiliates that are consolidated for tax and/or accounting purposes are referred to collectively herein as "Kingsway." KFS and its senior management dominate and control Kingsway. Despite the highly-profitable nature of TRT LeaseCo's business, in its purchase, KFS advanced only $1.5 million in cash. The value that Kingsway brought to the July 2016 CMC Industries transaction consisted of more than $800 million dollars in net operating losses ("NOLs") available to offset tens of millions of dollars in anticipated taxable profits generated by TRT LeaseCo. Indeed, the MSA contemplated the return to Kingsway of its $1.5 million advance, making NOLs the real value that Kingsway brought to the transactions.

5.     DGI provided the contemplated services leading to the closing of a transaction that triggered quarterly payments of Services Fees for Asset Management Services. These services by DGI led to increased lease obligations of BNSF totaling in excess of $25 million, as well as BNSF's agreement to a purchase option at the end of the lease in the amount of

2

$150 million. Under the MSA, DGI is expressly entitled to not less than quarterly payments representing 80% of the cash generated from the qualifying transaction with BNSF.

6.      In an attempt to divert the fees to Kingsway that should be paid to DGI, Kingsway has caused TRT LeaseCo's holding company, CMC Industries, to enter into a new tax allocation agreement among Kingsway's affiliates. Prior to this change, Kingsway used internally a Second Amended and Restated Kingsway Affiliated Group Tax Allocation Agreement (the "Original Tax Agreement"), which was referenced in the SPA and disclosed in due diligence. The Original Tax Agreement lacked any clause that required specific payments by a subsidiary (such as CMC Industries or TRT LeaseCo) to any affiliate or the parent for the use of NOLs. When inducing CRIC and DGI into the SPA and MSA, Kingsway represented that it had available hundreds of millions of dollars in NOLs that needed to be used or could be forever lost, giving it flexibility in how it could be compensated for the use of them through an equity interest rather than cash payments.

7.      Approximately five months after the MSA and SPA closed, Kingsway caused its fiduciaries, who dominated and controlled the board of CMC Industries, to cause CMC Industries to enter into a Third Amended and Restated Kingsway Affiliated Group Tax Allocation Agreement (the "New Tax Allocation Agreement"). At a telephonic meeting of CMC Industries' board of directors, the conflicted fiduciaries who served Kingsway and controlled CMC Industries (and, in turn, TRT LeaseCo) caused the adoption of a board resolution for CMC Industries to enter into the New Tax Allocation Agreement.

8.      Paragraph 5 of the New Tax Allocation Agreement, which had not appeared in the Original Tax Agreement, included language that purported to require for the first time that "each Subsidiary shall pay to the Parent" some amount of excess separate tax liability, though

ambiguously qualified that obligation by referring to the "calculation under Paragraph 2," a provision that addressed the allocation of any actual taxes paid by the consolidated group to a taxing authority, not a fictitious allocation among members of a tax group where no taxes were required to be paid.

9.      Notably, KFS did not share with DGI or CRIC a copy of the proposed form of the New Tax Allocation Agreement. Instead, Hassan Baqar, a conflicted fiduciary of both CMC Industries (and, in turn, TRT LeaseCo) and Kingsway falsely represented that the only items that had been changed in the New Tax Allocation Agreement were to add or delete entities from the tax group that he claimed Kingsway did every few years to clean the agreement up for any acquisitions or disposals Kingsway had made and to add some clarifying language, but purportedly nothing of substance that would impact CMC Industries.

10.     While aspects of this new clause still appear ambiguous, Kingsway has caused CMC Industries and TRT LeaseCo to take the position that they must pay dollar-for-dollar cash for each of the NOLs that Kingsway's affiliates provide to offset TRT LeaseCo's income. This position has fundamentally altered the transaction among the parties. Under the parties' agreement, while CMC Industries would compensate Kingsway for its share of any *actual* federal taxes paid to a taxing authority by the consolidated group, Kingsway received its compensation through the existence of its valuable 81% equity interest in CMC Industries.

11.     DGI seeks specific performance by TRT LeaseCo under the MSA and a declaratory judgment requiring TRT LeaseCo to make the not less than quarterly payments to DGI of the Services Fees for Asset Management Services.

**Parties**

12.     Plaintiff DGI-BNSF Corp. ("DGI") is a Delaware corporation with its principal place of business in Ontario, Canada.

13.     Defendant TRT LeaseCo, LLC ("TRT") is a Delaware limited liability company whose sole member is CMC Industries, a Texas corporation with its principal place of business in Texas or Illinois.

**Jurisdiction and Venue**

14.     This Court has jurisdiction over this dispute because complete diversity exists under 28 U.S.C. § 1332 and the amount in dispute exceeds $75,000 exclusive of interest and costs.

15.     Venue is appropriate in this District under Paragraph 6(j) of the MSA, under which the parties have agreed to jurisdiction and venue in this Court for "all disputes, legal actions, suits and proceedings arising out of or relating to [the MSA]." A copy of the MSA is attached as Exhibit 1 hereto and incorporated herein by reference.

**Factual Background**

*An Affiliate of DGI Acquires CMC Industries*

16.     In or about mid-March 2015, Macquarie Corporate and Asset Finance, a division of Macquarie Group closed on the sale to CRIC, an affiliate of DGI, of all the stock of CMC Industries, an entity that holds through subsidiaries what is known as the BNSF Logistics Facility.

17.     A wholly-owned subsidiary of CMC Industries, TRT LeaseCo, owns a 4,700-car rail logistics facility located in Dayton, Texas, that has supported the area's robust petrochemical

industry. These assets are fully leased to BNSF Railroad on a triple net lease that, by its terms, runs through year 2034 (the "BNSF Lease").

18.     At the time of the acquisition, the BNSF Lease generated monthly rental payments in excess of $810,000, with regularly scheduled increases over the remaining life of the lease.

19.     CRIC's acquisition of CMC Industries involved financing through a Massachusetts-based advisor that brought in mortgage lenders, which in turn utilized Wells Fargo Bank Northwest, N.A., as trustee on behalf of the mortgage lenders ("Wells Fargo"), and as an escrow agent under a related escrow agreement (the "Wells Escrow").

20.     TRT LeaseCo executed a promissory note dated March 12, 2015 (the "Note"), which was made in connection with related documents including a Deed of Trust.

21.     Initial monthly Note payments were approximately $776,780 of which approximately $157,235 covered principal obligations and the remaining $619,545 covered interest. The monthly payment amount would grow eventually to approximately $1,185,762, with approximately $951,900 covering principal obligations and the remaining approximately $233,862 covering interest.

22.     At the end of the Note term, TRT LeaseCo would owe a balloon payment of approximately $68 million.

23.     Wells Fargo is the escrow agent that administers the Wells Escrow, which holds the lease payments made to TRT LeaseCo under the BNSF Lease. The Wells Escrow allowed Wells Fargo to retain payments under the BNSF Lease sufficient to cover upcoming payments under the Note, a monthly servicing fee, and certain other amounts due to Wells Fargo. The Wells Escrow made any remaining balance subject to established disbursement instructions.

*TRT LeaseCo Generates Substantial Income*

24.     The disbursements to date to TRT LeaseCo from the Wells Escrow have resulted in substantial cash payments to TRT LeaseCo, a large portion of which should be, but has not been, paid to DGI under the MSA.

25.     TRT LeaseCo has operated with limited expenses beyond servicing the Note. The principal obligations under the Note have not been considered, however, tax deductible. For tax purposes, TRT LeaseCo was and is a pass-through entity whose tax liabilities have belonged to CMC Industries.

26.     The financial dynamics of TRT LeaseCo and CMC Industries created an opportunity for a strategic relationship with an entity that possessed substantial NOLs. Under federal tax laws and regulations, such NOLs cannot simply be sold or purchased. An entity that possesses NOLs can, however, acquire an 80% or greater interest in a profitable entity, consolidate operations with that entity for financial and tax purposes, and then apply NOLs to reduce or eliminate federal income tax obligations of the acquired entity.

*Kingsway Accumulates Massive Amounts of NOLs*

27.     Defendant TRT LeaseCo is an affiliate of and dominated and controlled by Kingsway.

28.     By the end of 2015, upon information and belief, Kingsway had accumulated over $849 million in NOLs potentially available for federal income tax purposes.

29.     Upon information and belief, Kingsway viewed available NOLs as potentially valuable, but the ability to monetize them extremely uncertain.

30.     At relevant times, Kingsway warned its stockholders that, despite valuing the massive amount of NOLs as substantial assets on its balance sheet, its ability to use the NOLs

could be limited by either its inability to generate future taxable income or a change of ownership interests of certain key stockholders.

31.     Kingsway has continued to suffer net income losses and thereby accumulate even more NOLs. By the end of 2016, upon information and belief, Kingsway had generated consolidated NOLs for federal income tax purposes of approximately $859.5 million.

32.     Such NOLs can be available to reduce income taxes that might otherwise be incurred on future federal taxable income of consolidated entities.

33.     Kingsway's NOLs have various expiration dates.

34.     Kingsway knows and has warned its investors there could be no assurance that it would generate the taxable income in the future necessary to utilize its NOLs before they expired.

35.     The use of NOLs is restricted in other ways, including a loss of them if certain changes occur in the consolidated entity's ownership among owners having an interest of 5% or more. Upon information and belief, this limitation placed Kingsway's ability to use NOLs at the mercy of its largest shareholders.

36.     As a result, upon information and belief, in or about 2016, Kingsway was highly motivated if not desperate to find ways to monetize its massive accumulation of NOLs.

*Kingsway Approaches CRIC with NOLs*

37.     By early 2016, Kingsway was interested in getting value out of NOLs before they expired.

38.     At that time, CRIC was interested in a strategic relationship with an entity that could provide NOLs to assist CRIC in limiting or eliminating CMC Industries' tax exposure.

39.     A third party working for Kingsway introduced it to CRIC.

40.     At the time, Kingsway had available more than $849 million in NOLs that could eliminate tax liabilities for a profitable joint venture in which Kingsway would own at least 80% of the equity, while Kingsway could still compensate CRIC or its affiliate beyond its minority interest for other services.

41.     As it approached CRIC to engage in a transaction, Kingsway consistently represented that it had hundreds of millions of dollars of NOLs available and could be compensated for them by an equity interest, rather than cash. This amount of NOLs should have been more than sufficient to eliminate federal tax payments for CMC Industries upon a consolidation with Kingsway. For example, on or about April 18, 2016, Kingsway represented in substance to representatives of CRIC that Kingsway had $900 million in NOLs at that time available for this purpose.

42.     From the outset, the availability of NOLs was the real value that Kingsway and CMC Acquisition were contributing to the venture in exchange for the equity share. Based on discussions at the time, the parties knew that CRIC was not interested in simply replacing CMC Industries' tax payments to a taxing authority with the same or similar payment obligations to Kingsway.

***KFS's Affiliate Acquires Majority of CMC Industries' Stock***

43.     In or about early 2016, principals of DGI and CRIC, on the one hand, and principals of Kingsway and CMC Acquisition, on the other, negotiated a potential transaction related to CMC Industries. During these negotiations, a principal of CRIC, Leo Schwartz, and a principal of Kingsway, Larry Swets, discussed and sought to establish parameters that would essentially make the CRIC constituents and Kingsway constituents 50-50 partners in the joint venture in the operations of CMC Industries as it existed at the time, while giving the principals

of CRIC an opportunity to receive quarterly payments if they could negotiate certain types of transactions with TRT LeaseCo's tenant, BNSF.

44.     During the negotiations, Kingsway represented that it had available more than $800 million in NOLs that needed to be used or could be forever lost, giving Kingsway flexibility in how it could be compensated for the use of them through an equity interest rather than cash payments.

45.     As an entity focused on monetizing NOLs, Kingsway benefitted from an ability to offer flexible forms of compensation to take advantage of possible opportunities. As a result, Kingsway utilized internally the Original Tax Agreement, which lacked any clause that specified how a subsidiary would compensate Kingsway's affiliates for the use of NOLs.

46.     As a result of their early 2016 negotiations, the principals reached the following key understandings: (1) Kingsway possessed hundreds of millions of dollars in NOLs with various expiration dates from which it would make available sufficient NOLs that should offset and eliminate actual federal tax liability otherwise payable by TRT LeaseCo and CMC Industries; (2) Kingsway would advance $1.5 million in cash; (3) an affiliate of CRIC, DGI, would receive Services Fees that would provide it with at least quarterly cash flow from certain transactions it might negotiate with BNSF such as an amendment to the BNSF Lease that would provide for an increase in rents and/or a sale to BNSF (the "BNSF Lease Amendment"); (4) Kingsway would receive a return of its $1.5 million, as well as an 81% equity share of net proceeds after the payment of the Services Fees to DGI, from the operations of and eventual proceeds from the sale of CMC Industries.

47.     In order to achieve the approximate 50-50 split agreed-upon by the parties to the joint venture, the parties agreed that DGI would enter into a separate MSA that established

10

certain rights for DGI to receive, as a priority in the waterfall of payments, not less than quarterly payments from TRT LeaseCo in the event of, among other things, the BNSF Lease Amendment and/or an eventual sale of the BNSF facility.

48.     To implement the joint venture between CRIC and Kingsway, on or about May 17, 2016, CRIC and CMC Acquisition signed several documents, including but not limited to the SPA, a Stockholders' Agreement, and an Escrow Agreement for the cash element of the purchase price and a franchise tax fee. The parties attached the MSA as an exhibit to the SPA.

49.     In the SPA, the parties to the merger agreed that following the closing of the merger, the board of directors of CMC Industries and its subsidiaries would cause CMC Industries to become a party to the Original Tax Agreement that Kingsway represented it used at the time. Doing so caused CMC Industries to join Kingsway's consolidated group of affiliates for the purposes of allowing the use of NOLs among group members and allocating the taxes paid by the consolidated group, if any, that remained payable after the use of NOLs.

50.     In March 2016, prior to signing the SPA, Kingsway provided CRIC and its affiliates with a redacted copy of the Original Tax Agreement.

51.     Neither the SPA nor the Original Tax Agreement included any provision that would require a member of the consolidated group to pay anything in particular to other members or the Parent for the use of NOLs.

52.     Neither CRIC nor DGI agreed that CMC Industries would have to pay any of the Kingsway affiliates for taxes that were eliminated by way of NOLs beyond repaying the $1.5 million cash advance to CMC Acquisition and the value of the equity interest in CMC Industries that CMC Acquisition acquired. Likewise, neither CRIC nor DGI agreed to treat taxes that were

eliminated by use of NOLs as a dollar-for-dollar expense of CMC Industries just as if the eliminated taxes were actually paid to a tax authority.

53.     On behalf of Kingsway and its affiliate CMC Acquisition, Swets had stated in substance while negotiating the transaction that the operative documents would have to remain vague in certain respects to implement the agreed-upon economic terms without interfering with expected tax benefits. Similarly, on or about November 3, 2016, Swets stated in substance to CRIC and DGI that the SPA and ancillary agreements had been vague in order not to interfere with the economics of the joint venture for tax purposes. Swets claimed that such vague language would enable Kingsway to obtain a satisfactory tax opinion letter while honoring the parties' agreed-upon business terms.

54.     As part of the 50-50 split agreed-upon by the parties to the joint venture as it existed, the SPA also required, as a condition of closing, that DGI and TRT LeaseCo enter into the MSA to provide for a priority not less than quarterly payment to DGI, which would include expressly assigned percentages of proceeds from positive lease amendments and/or a sale transaction. For the BNSF Lease Amendment, which increased rents and placed an option to purchase in place, DGI received an 80% share of proceeds because the transaction closed within 3 years of the execution of the MSA.

55.     The parties to the merger and Kingsway knew that an increase to the BNSF Lease was possible, if not likely, and specifically discussed that such an amendment would immediately generate positive cash flow for DGI, on at least a quarterly basis.

56.     The MSA expressly provided for periodic "but not less than quarterly" Services Fee payments to DGI from any increase in rental payments as a result of the amendment, while

also calling for the repayment of CMC Acquisition's advance of $1.5 million as the cash element of the purchase price and payment of certain expenses.

57.     On or about July 14, 2016, the merger transaction closed.

58.     Under the SPA, CMC Acquisition made a cash advance of $1.5 million to CRIC, which would go back to CMC Acquisition as certain amounts of cash accrues.

59.     By in or about January 2017, DGI caused TRT LeaseCo to close on the BNSF Lease Amendment that generates substantial additional payments. As a result, additional cash flow totaling $25 million would continue throughout the leasehold, entitling DGI to not less than quarterly payments totaling approximately $18.8 million, representing DGI's right to 80% of the increase subject to the repayment of the $1.5 million cash advance.

60.     In an April 25, 2017 Annual Letter to Shareholders, Kingsway described its partnership with DGI and CRIC's principals, Messrs. Schwartz and Krauss:

> CMC [Industries] is the operating business that holds the credit tenant lease with BNSF. We own 81% of the company and consolidate for accounting and tax. The lease expires in 2034, by which time $112.0 million of the non-recourse debt assumed at the time of the acquisition will have been paid down. Our investment in CMC was under $2 million but has generated an increase in GAAP shareholders' equity of $10.7 million during 2016. Earlier this year, *our partners Leo and Larry* at Terracap negotiated a significant enhancement to the lease with BNSF.

***Interference with DGI's Contractual Rights***

61.     By late 2016, DGI and CRIC had made significant progress towards finalizing the valuable BNSF Lease Amendment.

62.     At about the same time, Swets, on behalf of Kingsway and its affiliate CMC Acquisition, took various positions in discussions about anticipated cash-flow splits that

appeared different from the parties' understandings embodied in the SPA, the MSA and the Original Tax Agreement.

63.     When CRIC and DGI attempted to address those issues, Kingsway and Swets insisted on first finalizing the (valuable) BNSF Lease Amendment.

64.     Substantially into negotiations of the BNSF Lease Amendment, in or about November 2016, Swets stated in substance that he had then-recently spent substantial time reviewing the deal. Despite having worked on the deal with a team of lawyers, accountants and tax specialists, he claimed that during his review the terms appeared complicated, and that he had only just realized that there was no inside tax basis in the assets.

65.     Swets further suggested that it was lucky that Kingsway dealt with this issue in the parties' agreements, but he did not explain what he meant. His positions remained vague, but even in general contradicted the parties' key understanding of DGI's entitlement, under the MSA, to not less than quarterly cash payments of 80% of the cash flow from the BNSF Lease Amendment as the funds are received.

66.     In addition, Swets, on behalf of Kingsway, said that he would negotiate modifications of the MSA that he claimed were (purportedly) necessary to get any cash flow to DGI on an ongoing basis while satisfying tax advisors. Swets pushed, however, to get the BNSF Lease Amendment done so that the parties could understand the totality of purported issues that they faced.

67.     Unknown to DGI or CRIC, at the time Swets made these representations on behalf of Kingsway, Swets had no plan to agree to any such modification of the MSA.

68.     On or about December 7, 2016, in reliance on Kingsway's representations, counsel for CRIC and DGI circulated to counsel for Kingsway and its affiliates draft

amendments to the BNSF Lease and draft corporate resolutions to approve them. In addition, CRIC and DGI proposed an amendment to the MSA that would eliminate any purported uncertainty that Swets had suggested about cash-flows.

69.     On December 14, 2016, Kingsway and CMC Acquisition, the now controlling stockholder of CMC Industries (and, in turn, its pass-through subsidiaries including TRT LeaseCo) called a board meeting to take place on December 16, 2016, purportedly to address certain "housekeeping items."

70.     The board meeting took place on December 16, 2016, over which Hassan Baqar, an officer of KFS and a director of CMC Industries, presided. Just prior to the board meeting, Baqar circulated draft resolutions, which he described as addressing "housekeeping items."

71.     One of the proposed resolutions was to appoint Baqar as Vice President of CMC Industries.

72.     Another proposed resolution was to adopt the New Tax Allocation Agreement to replace the Original Tax Agreement. The proposed New Tax Allocation Agreement had not been circulated to the board members or to CRIC or DGI prior to or even at the board meeting.

73.     At the December 16, 2016 telephonic board meeting, Baqar represented that the only items that had been changed in the New Tax Allocation Agreement were to add or delete entities from the tax group that he claimed Kingsway did every few years to clean the agreement up for any acquisitions or disposals Kingsway had made and to add some clarifying language, but purportedly nothing of substance that would impact CMC Industries.

74.     At the meeting, conducted approximately five months after the MSA and SPA closed, KFS caused its fiduciaries who now dominated and controlled the board of CMC Industries to cause CMC Industries to enter into the New Tax Allocation Agreement. During the

telephonic meeting of CMC Industries' board of directors, the conflicted fiduciaries who served

KFS and controlled CMC Industries (and, in turn, TRT LeaseCo) caused the adoption of a board

resolution for CMC Industries to enter into the New Tax Allocation Agreement.

75.     Paragraph 5 of the New Tax Allocation Agreement, which had not appeared in the

Original Tax Agreement, stated:

> For each taxable period for which the Parent files a consolidated federal income
> tax return on behalf of the Affiliated Group, each Subsidiary shall pay to the
> Parent the excess of such Subsidiary's separate return tax liability, as calculated
> under paragraph (2) of this tax allocation agreement, over any payments
> previously made to the Parent for such tax period for estimated taxes or extension
> payments.  Such payment shall be made within seven (7) days of receiving notice
> of such payment from the Parent, but in no event later than ninety (90) days after
> the date the consolidated federal income tax return is filed by the Parent on behalf
> of the Affiliated Group for such taxable period.  All settlements shall be in cash.

76.     Later, Baqar repeated his representation in substance that the only items that had

been changed in the New Tax Allocation Agreement were to add or delete certain entities from

the tax group and to add certain clarifying language that he said would not affect substantive

rights of CMC Industries.

77.     Contrary to Baqar's representations that the changes in the New Tax Allocation

Agreement were mere non-substantive clarifications of apparent ambiguities in the Original Tax

Agreement, Baqar knew when he made those representations that the New Tax Allocation

Agreement contained a convoluted but substantive new term that, for the first time, purported to

specify some situation in which a subsidiary would have to pay the parent company for certain

excess tax obligations.

78.     Upon information and belief, Baqar and/or other officers and directors of KFS

and CMC Acquisition signed the New Tax Allocation Agreement while also serving as a director

and officer of CMC Industries, without making fair and adequate disclosures of the terms and the

position that KFS would take and cause CMC Industries and TRT LeaseCo to take about the impact of the substantive changes.

79.     Upon information and belief, KFS and CMC Acquisition, as the controlling stockholder of CMC Industries, breached fiduciary duties of loyalty owed to CMC Industries and its subsidiaries, including TRT LeaseCo, when proposing and executing the New Tax Allocation Agreement. The New Tax Allocation Agreement amounted to self-dealing by the board members of CMC Industries who served as fiduciaries to KFS and CMC Acquisition as they secretly added a substantive term that they intended to claim would support Kingsway charging CMC Industries dollar-for-dollar for the use of tens of millions of dollars in NOLs.

80.     While Baqar claimed on behalf of KFS and Kingsway that the New Tax Allocation Agreement merely added some clarifying language, it actually added language that Kingsway attempts to use as substance that changes the entire economic realities of the CMC Industries transaction among the parties. His comment about adding clarity does, however, confirm that the Original Tax Agreement was at least ambiguous in terms of any purported obligation of CMC Industries to pay dollar-for-dollar for NOLs. Indeed, unlike the convoluted Paragraph 5 in the New Tax Allocation Agreement, nothing in the Original Tax Agreement remotely provided for any sort of obligation of a subsidiary to pay anything to a Kingsway affiliate except possibly in the event of an actual tax payment to a taxing authority by the consolidated group.

81.     Under Kingsway's view of the effect of the new Paragraph 5 in the New Tax Allocation Agreement, DGI and CRIC would receive nothing material out of the transaction. Instead, not only would Kingsway receive tens of millions of dollars in cash for the use of some of its more than $850 million in NOLs that it was and is desperate to find some use for, but it

would also receive the fruits of its 81% equity interest in CMC Industries and the return of its $1.5 million cash advance. Kingsway's position hardly reflects the economic realities of the terms on which the parties actually agreed or anything remotely reasonable or equitable. Even with the benefit of a decrease in federal corporate income tax rates, which decreases the amount Kingsway seeks to pay itself for NOLs, Kingsway has essentially misappropriated the entire fruits of the transaction for itself. Kingsway's position runs dramatically contrary to the what would be expected generally in similar industries in terms of compensation to a party that can bring excess NOLs to a transaction.

82.     Kingsway and CMC Acquisition had indicated that the Original Tax Agreement may be amended from time to time to add or delete certain entities from the Kingsway consolidated tax group. DGI never agreed that CMC Acquisition and its affiliates could implement an amendment that would substantively change the deal among the parties, particularly with such a potentially drastic impact that would make the MSA and the SPA illusory. Consistent with DGI's understandings, on behalf of CMC Acquisition and Kingsway, Baqar represented when describing the amendment to the Original Tax Agreement that the only changes in the New Tax Allocation Agreement were to add or delete certain entities from the consolidated tax group and to add certain clarifying language that would not affect substantive rights of CMC Industries.

83.     After learning that DGI reached terms for the BNSF Lease Amendment, on or about January 19, 2017, Baqar addressed the amendment to the MSA that CRIC and DGI proposed to Kingsway, stating: "For the record, Kingsway is not in agreement with the proposed amendment to the MSA…."

84.     Shortly thereafter, CMC Industries approved the BNSF Lease Amendment negotiated by CRIC and DGI.

85.     In an April 25, 2017 Letter to Stockholders, Kingsway touted the valuable lease amendment that CRIC and DGI obtained:

> In exchange for an additional $25 million in lease payments (spread over the remaining 17 years of the lease), we provided a purchase option at $150 million. With a balloon of $68 million on the debt at lease expiration in 2034, we look forward to additional value being recognized on this operation.

**_Kingsway Has Caused TRT LeaseCo to Repudiate its Contractual Obligations to DGI_**

86.     Pursuant to the MSA, DGI is entitled to receive, in not less than quarterly payments, 80% of the $25 million BNSF Lease Amendment, after repayment of the $1.5 million cash advance by CMC Acquisition and certain other actual expenses, if any, resulting in value to DGI in the amount of approximately $18.8 million.

87.     Subsequent to DGI and CRIC finalizing the BNSF Lease Amendment, Kingsway has caused TRT LeaseCo to refrain from paying DGI its contractually required cash flow from the BNSF Lease Amendment, not less than quarterly, as expressly contemplated by the MSA. In fact, Kingsway has refused even to acknowledge that obligation.

88.     Instead, Kingsway now takes and causes TRT LeaseCo to take the position that CMC Industries' obligations under Kingsway's tax allocation agreement result in a cash flow structure that would divert all or virtually all of the value from the BNSF Lease Amendment to Kingsway in a manner that would preclude the not less than quarterly payments on which the parties had agreed.

89.     In particular, since in or about the fall of 2017, Kingsway has demanded that CMC Industries (and its subsidiary TRT LeaseCo) pay Kingsway dollar-for-dollar for the amount of federal income taxes that CMC Industries saves because of the use of NOLs as a

member of the consolidated group of Kingsway affiliates, apparently relying on Paragraph 5 of the New Tax Allocation Agreement.

90.     By in or about January 2018, Kingsway confirmed that Kingsway's consolidated tax group, including CMC Industries has not paid and does not owe any federal taxes since the acquisition, yet still claimed that CMC Industries had a contractual obligation to make payments to Kingsway for taxes that it would have paid as a stand-alone entity. Under Kingsway's view of the parties' rights and obligations, CMC Industries receives essentially nothing in the transaction because every dollar it would have had to pay in federal income taxes it pays instead to Kingsway, along with giving other substantial value in terms of equity rights and control.

91.     The parties to the merger, TRT LeaseCo and DGI never agreed that, by supplying NOLs, Kingsway would receive payment of the equivalent amount of federal taxes that CMC Industries never actually has to pay to a taxing authority. Rather, Kingsway received substantial equity in CMC Industries and related interests in the ultimate sale of the property underlying the BNSF Lease and in the operations until that time.

92.     Under Kingsway's apparent view of the transaction, which it has sought to bolster by its deceptive adoption of the New Tax Allocation Agreement, CMC Industries is required to pay taxes to Kingsway rather than to a taxing authority. Unlike a taxing authority, however, Kingsway has required that CRIC give up 81% of equity in CMC Industries to Kingsway affiliate CMC Acquisition. As a result of Kingsway's and CMC Acquisition's control over CMC Industries (and TRT LeaseCo) to make them adopt this position, CMC Industries did not act in good faith when entering into the New Tax Allocation Agreement and TRT LeaseCo has not acted in good faith when refusing to make the requisite Services Fee payments to DGI under the MSA not less than quarterly.

93.     The parties never had a meeting of the minds on the transaction as Kingsway has framed and controlled it months after closing. If Kingsway really were permitted to change the substance of the SPA and MSA by substantively amending its internal tax allocation agreement, then the SPA and MSA were illusory. To avoid that result, CMC Industries' (and, in turn, TRT LeaseCo's) entry into Paragraph 5 of the New Tax Allocation Agreement must be deemed a breach of the duty of good faith and fair dealing in a manner that would excuse any condition in the MSA or otherwise that could prevent TRT LeaseCo from making the not less than quarterly Services Fee payments to DGI under the MSA.

### Count One
(Declaratory Relief)

94.     DGI repeats and incorporates each of its prior allegations as if repeated in full herein.

95.     As a result of positions taken by Kingsway and TRT LeaseCo described above, a ripe dispute and controversy exists concerning the contractual rights between DGI and TRT LeaseCo under the MSA. TRT LeaseCo has breached its obligations to DGI and clearly and unequivocally repudiated imminent obligations in anticipation of them.

96.     The efforts by Kingsway to charge CMC Industries and its wholly owned subsidiary TRT LeaseCo for NOLs results in a breach by TRT LeaseCo of its payment obligations under the MSA as well as a breach of the implied covenant of good faith and fair dealing. All conditions precedent to TRT LeaseCo's obligations under the MSA have been satisfied or excused.

97.     Accordingly, the Court should declare that, under the MSA, TRT LeaseCo must make not less than quarterly payments to DGI from the BNSF Lease Amendment proceeds in the Wells Escrow without making payments to Kingsway for NOLs, including under Paragraph 5 of

the New Tax Allocation Agreement that arose from breaches of fiduciary duties by Kingsway's appointees to CMC Industries' and TRT LeaseCo's board and management. These payments to DGI would remain subordinate to the mortgage payments made pursuant to the Wells Escrow.

### Count Two
(Breach of the MSA – Specific Performance)

98.     DGI repeats and incorporates each of its prior allegations as if repeated in full herein.

99.     The MSA is a valid and enforceable agreement between DGI and TRT LeaseCo that requires periodic not less than quarterly payments by TRT LeaseCo to DGI of 80% of the $25 million BNSF Lease Amendment which, after payment of certain other matters, results in value to DGI in the amount of approximately $18.8 million.

100.     DGI has fully or substantially performed its obligations under the MSA.

101.     All conditions precedent to TRT LeaseCo's obligations under the MSA have been satisfied or excused.

102.     As described above, Kingsway and its affiliate CMC Acquisition, as the controlling equity holders in CMC Industries and, in turn, TRT LeaseCo, have taken positions that result in TRT LeaseCo's breach of its obligations to DGI under the MSA.

103.     At present, TRT LeaseCo possesses more than $938,000 in cash that could be used toward quarterly Services Fee payments.

104.     The obligations of TRT LeaseCo under the MSA are unique. No other entity can replace TRT LeaseCo as an obligor. The obligation itself must be enforced against TRT LeaseCo in order to generate the agreed-upon waterfall of payments from the entity that is accumulating the excess cash.

105.     DGI has no adequate remedy at law against TRT LeaseCo. If DGI were to obtain a judgment for the full loss of value that Kingsway has caused DGI to suffer, and TRT LeaseCo cannot satisfy the entire judgment within ninety (90) days, an Event of Default would arise under the Deed of Trust with lenders on that property and could result in foreclosure. Instead, the most equitable remedy is to require TRT LeaseCo to make the requisite service fee payments to DGI, not less than quarterly, after satisfaction of the existing mortgage payments on the underlying property. The alternative of bringing successive lawsuits for each breach by TRT LeaseCo is not adequate because it would require an inefficient multiplicity of actions.

106.     Also, without an order of specific performance, TRT LeaseCo's representatives who manage its funds face disputes about how they should distribute excess cash as it continues to accumulate.

107.     The equities tip decidedly in favor of DGI.

108.     Accordingly, this Court should order TRT LeaseCo to perform its obligations under the MSA, including to make the not less than quarterly payments to DGI totaling 80% of the proceeds from the $25 million BNSF Lease Amendment, without deducting amounts for payments to Kingsway for NOLs, including under Paragraph 5 of the New Tax Allocation Agreement. These payments to DGI would remain subordinate to the mortgage payments made pursuant to the Wells Escrow.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff DGI-BNSF Corp. prays for the following relief:

1.  That judgment be entered in favor of DGI on all claims set forth in its Complaint;

2.  that on Count One, the Court award the requested declaratory relief;

3.  that on Count Two, the Court order that TRT LeaseCo specifically perform its contractual

    obligations to DGI;

4.  that the Court award to DGI its attorneys' fees, costs, expenses, and pre-judgment and

    post-judgment interest;

5.  that the Court award to DGI any and all further and other relief to which it may be

    entitled at law or in equity.

Dated:   April 13, 2018                    Respectfully submitted,

                                           /s/Phillip Rakhunov
                                           Barry S. Pollack
                                           Phillip Rakhunov
                                           POLLACK SOLOMON DUFFY LLP
                                           48 Wall Street, 26th Floor
                                           New York, NY 10005
                                           212-493-3100 (Tel)
                                           617-960-0490 (Fax)
                                           bpollack@psdfirm.com
                                           prakhunov@psdfirm.com