USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 11/06/2019

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
DGI-BNSF CORP.,                                                :
                                                               :
                                      Plaintiff,               :     18-CV-3252 (VEC)
                                                               :
                 -against-                                     :     MEMORANDUM
                                                               :     OPINION AND ORDER
TRT LEASECO, LLC,                                              :
                                                               :
                                      Defendant.               :
-------------------------------------------------------------- X

VALERIE CAPRONI, United States District Judge:

  The parties are two of several entities involved in an elaborate transaction designed to reduce payments of federal income tax. Plaintiff, through intermediate entities, owned and controlled Defendant TRT LeaseCo, LLC, which generates income from a rail facility. Non-party Kingsway Financial Services, Inc. (and its affiliates) held over $800 million in net operating losses, which could be used to offset otherwise taxable profits. Plaintiff, seeking to take advantage of Kingsway's unused and expiring tax benefits, entered into an agreement to transfer a majority interest in TRT LeaseCo, LLC to a Kingsway subsidiary, so that Kingsway's losses could be applied to TRT LeaseCo, LLC's profits for tax purposes, even though the entities were otherwise unrelated. According to Plaintiff's version of their agreement, once the net operating losses were applied and other expenses paid, TRT LeaseCo, LLC was obligated to remit a portion of the remaining profits back to Plaintiff in the form of quarterly fee payments. Because TRT LeaseCo, LLC has not made those payments, Plaintiff commenced this action for breach of contract. Plaintiff now moves for leave to amend the Complaint to add a fraudulent inducement claim, alleging that Kingsway's representative, during the negotiation of the tax arrangement, effectively promised that DGI would receive the quarterly payments despite having

already made plans to divert those payments. Contrary to Defendant's contention, the amendment to add a fraud claim, although perhaps a long shot, is not futile, and DGI's motion for leave to amend is GRANTED subject to the requirements set forth below.

## BACKGROUND[1]

Plaintiff DGI-BNSF CORP. (DGI) has an affiliate, CRIC TRT Acquisition, LLC (CRIC), which acquired the entirety of CMC Industries, Inc. (CMC). PAC ¶ 16. CMC, in turn, has a wholly-owned subsidiary, TRT LeaseCo, LLC ("TRT"), which owns railroad facilities that it leases to BNSF Railway Company. PAC ¶ 17. The BNSF lease generates monthly rental payments of over $800,000. PAC ¶ 18. The lease payments are disbursed to TRT by an escrow agent, who first ensures that certain monthly obligations are satisfied. PAC ¶¶ 23–24. The lease payments generate significant income and tax liability for CMC. PAC ¶ 24–25.

Kingsway Financial Services, Inc. (KFS) is a publicly traded company involved in insurance and merchant banking services. PAC ¶ 2. By the end of 2015, KFS and its affiliates (collectively "Kingsway") had accumulated over $800 million of net operating losses (NOLs), which can be used to offset profits before the assessment of federal income tax. PAC ¶ 28. Kingsway, which had carried the NOLs on its balance sheet as an asset, was not, however, generating enough income to make full use of the NOLs before they expired. PAC ¶¶ 30, 34.

DGI and Kingsway then hatched a scheme to use Kingsway's NOLs to offset DGI's income from TRT. DGI and Kingsway had determined that an entity possessing NOLs can "acquire an 80% or greater interest in a profitable entity, consolidate operations with that entity

---

[1] For purposes of this motion, the Court assumes the truth of the factual allegations in Plaintiff's Proposed Amended Complaint (PAC), Dkt. 44-1. *See IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 389 (2d Cir. 2015) ("[T]he standard for denying leave to amend based on futility is the same as the standard for granting a motion to dismiss."); *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991) ("The adequacy of the proposed amended complaint [] is to be judged by the same standards as those governing the adequacy of a filed pleading.").

for financial and tax purposes, and then use NOLs to reduce or eliminate federal income tax obligations of the acquired entity." PAC ¶ 26. To consolidate TRT with Kingsway for tax purposes, CRIC (the DGI affiliate that wholly owned CMC and thereby TRT) transferred 81% of its equity interest in CMC to a Kingsway affiliate, known as CMC Acquisition, LLC, pursuant to a Stock Purchase Agreement. PAC ¶ 2. That transfer caused Kingsway to acquire control of CMC and TRT. PAC ¶ 4. DGI expected that, after the transfer, CMC would become party to Kingsway's existing tax agreement for its affiliated entities, which would allow CMC and TRT to take advantage of Kingsway's NOLs. PAC ¶¶ 6, 50. Kingsway's negotiator, Larry Swets, told DGI that the 81% equity interest would be Kingsway's only compensation from the transaction, and that Kingsway would not require other payment for TRT and CMC's use of the NOLs. PAC ¶ 48.

DGI's expected upside in the transaction came in the form of "service fees," which represent a percentage of TRT's net income following the use of Kingsway's tax benefits. *See* PAC ¶¶ 1, 46. The Stock Purchase Agreement contained a Management Services Agreement (MSA),[2] which provides for not-less-than quarterly payments of a percentage of the proceeds from certain qualifying transactions. PAC ¶ 55. One of those qualifying transactions is a lease amendment between TRT and TRT's railyard tenant, BNSF. PAC ¶¶ 43, 46. That lease amendment increased BNSF's rent payments to TRT by a total of $25 million—DGI asserts that the MSA entitles it to 80% of that increase. PAC ¶ 60.

That mutually profitable scheme collapsed after the BNSF lease amendment was executed, and DGI has received no quarterly payments. *See* PAC ¶ 88. Rather than proceeding

---

[2]  The SPA was executed as of May 17, 2016, but the transaction did not become effective until, among other things, the execution of the MSA, which was effectuated on July 14, 2016. *See* SPA (Dkt. 61-1) at 1, 17, 19; MSA (Dkt. 44-3) at 1. Kingsway, therefore, did not acquire the 81% equity interest in CMC and effective control of TRT until July 14, 2016, after the negotiation of the terms of the MSA.

under the terms of Kingsway's original tax agreement, Kingsway caused CMC to become party to the Third Amended and Restated Kingsway Affiliated Group Tax Allocation Agreement ("New Tax Agreement"). PAC ¶ 7. Hassan Baqar, a CMC director and Vice President, was also a KFS officer. PAC ¶¶ 71–72. Baqar presented the New Tax Agreement to CMC's board as mere "housekeeping" that would not alter CMC's substantive rights. PAC ¶¶ 71, 73–77. In fact, the New Tax Agreement contained a provision, paragraph 5, that Kingsway construes to require each of its subsidiaries, including CMC and TRT, to pay Kingsway in cash for every dollar of tax savings derived from the use of its NOLs. PAC ¶¶ 76, 81–82. The net result of that, according to DGI, is that CMC and TRT's income is diverted to Kingsway, causing DGI to receive no quarterly payments. PAC ¶¶ 82, 91.

DGI initially commenced this action alleging that Kingsway's efforts to charge CMC and TRT for the use of the NOLs has caused TRT to breach the MSA. PAC ¶ 98. During discovery, DGI allegedly learned that Swets, during the negotiation of the transaction, falsely represented that Kingsway did not intend to require dollar-for-dollar compensation for CMC and TRT's use of NOLs, when, in truth and in fact, he never intended for DGI to receive the service fees contemplated in the agreement. PAC ¶ 48. On the basis of that newly discovered evidence, DGI sought leave from the Court to amend its complaint to add a claim against TRT for fraudulent inducement. *See* Dkt. 43. TRT contends that the amendment is futile and that leave should be denied because the fraud claim is duplicative of the contract claim. *See* Dkt. 49.

The Court ordered the parties to provide supplemental briefing on whether Swets' allegedly fraudulent statements, made prior to Kingsway's acquisition of TRT, can be attributed to TRT. Dkt. 59.

4

**DISCUSSION**

Pursuant to Rule 15 of the Federal Rules of Civil Procedure, "[t]he court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). "Leave to amend may be denied 'for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party.'" *Kim v. Kimm*, 884 F.3d 98, 105 (2d Cir. 2018) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007)). "[L]eave to amend will be denied as futile only if the proposed new claim cannot withstand a 12(b)(6) motion to dismiss for failure to state a claim, *i.e.*, if it appears beyond doubt that the plaintiff can plead no set of facts that would entitle him to relief." *Milanese v. Rust-Oleum Corp.*, 244 F.3d 104, 110 (2d Cir. 2001) (citing *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991)). TRT contends that DGI's new claim is futile because it is duplicative of DGI's existing contract claim and because the alleged fraudulent statements, made by Swets, who was a principal of Kingsway, cannot be attributed to TRT.

**1. DGI's fraud claim is not duplicative of the contract claim.**

As a general rule, "[m]ere unfulfilled promissory statements as to what will be done in the future are not actionable as fraud" and remain within the ambit of contract law.[3] *See Did-it.com, LLC v. Halo Grp.*, Inc., 174 A.D.3d 682, 683 (2d Dep't 2019) (internal citation and quotation marks omitted); *see also Wyle Inc. v. ITT Corp.*, 130 A.D.3d 438, 439 (1st Dep't 2015) ("[A]s a general rule, to recover damages for tort in a contract matter, it is necessary that the plaintiff plead and prove a breach of duty distinct from, or in addition to, the breach of contract."

---

[3] The MSA contains a choice of law provision, which provides that New York law governs "any claim, controversy or dispute arising out of or related to" the MSA. MSA (Dkt. 44-3) § 6(h). *See Krock v. Lipsay*, 97 F.3d 640, 645 (2d Cir. 1996) ("New York law gives full effect to parties' choice-of-law provisions . . . . Under New York law, in order for a choice-of-law provision to apply to claims for tort arising incident to the contract, the express language of the provision must be 'sufficiently broad' as to encompass the entire relationship between the contracting parties." (citations omitted)). Both parties agree that New York law applies to DGI's proposed fraud claim. *See* Dkt. 43 at 12 (citing New York law), Dkt. 49 at 3 (same).

(citation omitted)). In contrast, a plaintiff states a distinct cause of action for fraudulent inducement if it alleges that "the defendant made misrepresentations of present facts that were collateral to the contract and served as an inducement to enter into the contract." *Did-it.com*, 174 A.D.3d at 683.

Accepting DGI's allegations as true, DGI would not have entered into the MSA had Swets not promised that TRT would not be required to pay Kingsway for the use of NOLs because the absence of such a guarantee from Swets would eliminate DGI's upside under the agreement. PAC ¶ 48. Because the MSA does not address TRT's obligation, if any, to pay Kingsway for the use of NOLs, Swets' promise was "extraneous" to the contract that DGI is seeking to enforce. *See Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 20 (2d Cir. 1996) (citing *Deerfield Commc'ns Corp. v. Chesebrough-Ponds, Inc.*, 68 N.Y.2d 954, 956 (1986)). As alleged in the proposed pleading, it is plausible that Swets' contractually extraneous statements induced DGI to enter into the MSA.

Thus, the dispositive question is whether Swets' statements were misrepresentations of future intent, as TRT claims, or of "present facts," as DGI contends. That question is settled by controlling precedent from the New York Court of Appeals. As the state high court has repeatedly held, "a promise . . . made with a preconceived and undisclosed intention of not performing it" is "a representation of present fact, not of future intent." *Deerfield Commc'ns*, 68 N.Y.2d at 956 (citing *Sabo v. Delman*, 3 N.Y.2d 155, 160 (1957) ("[I]t is settled that, if a promise was actually made with a preconceived and undisclosed intention of not performing it, it constitutes a misrepresentation of 'a material existing fact.'" (citations omitted))). Because DGI alleges that Swets made promises about TRT's ability to use Kingsway's NOLs free-of-charge, when he had already hatched a contrary plan at Kingsway, DGI has plausibly alleged that Swets

6

misrepresented a "present fact."  TRT's futility argument, based on duplication, is therefore without merit.

### 2. Swets was plausibly an agent of TRT at the time the alleged misrepresentations were made.

DGI's proposed amendment would be futile if it is suing the wrong party for fraud.  To state a claim of fraudulent inducement in this case, DGI must plausibly allege that TRT made "a knowing misrepresentation of material present fact, which [was] intended to deceive [DGI] and induce [DGI] to act on it, resulting in injury."  *See Wyle*, 130 A.D.3d at 438–39; *see also Bridgestone*, 98 F.3d at 19 ("To prove fraud under New York law, a plaintiff must show that (1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." (quotation marks and citation omitted)).  Accepting DGI's factual allegations as true, Swets misrepresented a material fact (whether Kingsway would require payment for use of the NOLs) in order to induce DGI's assent to the transaction, which ultimately resulted in DGI being deprived of both its controlling interest in CMC and TRT and income from TRT's lucrative lease agreement.  DGI's proposed fraud claim, however, is not against Swets or Kingsway.  DGI instead posits an agency theory pursuant to which TRT should be held responsible for Swets' misconduct during the negotiation.

Agency is "a fiduciary relationship which results from the manifestation of consent of one person to allow another to act on his or her behalf and subject to his or her control, and consent by the other so to act."  *Maurillo v. Park Slope U-Haul*, 194 A.D.2d 142, 146 (2d Dep't 1993) (citing Restatement (Second) of Agency § 1).  For the agent to bind the principal, the principal must have imbued the agent with "actual authority," or at least the appearance of authority, to act on behalf of the principal, and the agent's actions must be within the scope of

the authority conferred. *See Dinaco, Inc. v. Time Warner, Inc.*, 346 F.3d 64, 68 (2d Cir. 2003) (discussing "actual authority" under New York law); *Herbert Const. Co. v. Cont'l Ins. Co.*, 931 F.2d 989, 993–94 (2d Cir. 1991) (discussing "apparent authority" under New York law); *Faith Assembly v. Titledge of New York Abstract, LLC*, 106 A.D.3d 47, 58 (2d Dep't 2013) ("A principal must answer to an innocent third person for the misconduct of an agent acting within the scope of its authority." (quotation marks and citation omitted)). If an agent acts outside the scope of its authority, "the principal is nevertheless liable if he later ratifies the fraudulent acts and retains the benefits derived from them." *Adler v. Helman*, 169 A.D.2d 925, 926 (3d Dep't 1991); *see Elwell v. Chamberlin*, 31 N.Y. 611, 619–20 (1865) ("It is not material that the plaintiffs authorized or knew of the alleged fraud committed by their agent [] in negotiating the [transaction]. They cannot be permitted to enjoy the fruits of the bargain without adopting all the instrumentalities employed by the agent in bringing it to a consummation."); *Chase Manhattan Bank, N.A. v. Perla*, 65 A.D.2d 207, 211 (4th Dep't 1978) ("[S]he is liable as a principal for the fraudulent acts of her agent committed within the scope of his authority. If he acted outside his authority, she is similarly liable if she later ratified his fraudulent acts and retained the benefits derived from them." (citations omitted)). Here, the Court must determine whether it is plausible that Swets was TRT's agent and that he acted within the scope of his authority when he allegedly defrauded DGI, and if he exceeded the authority conferred by TRT, whether TRT later ratified such conduct with full knowledge of the fraud.

Based on DGI's supplemental submission clarifying the relationship between TRT and Swets, the Court concludes that DGI may be able to plead a set of facts from which one can infer a delegation of authority from TRT to Swets to negotiate the MSA. *See Milanese*, 244 F.3d at 110 ("[L]eave to amend will be denied as futile only if . . . it appears beyond doubt that the

8

plaintiff can plead no set of facts that would entitle him to relief."). In the law of agency, "authority" refers to "the power of the agent to do an act or to conduct a transaction on account of the principal which, with respect to the principal, he is privileged to do because of the principal's manifestations to him." *Minskoff v. Am. Exp. Travel Related Servs. Co.*, 98 F.3d 703, 708 (2d Cir. 1996) (quoting Restatement (Second) of Agency § 7 cmt. a). Here, DGI represents that it will be able to show that TRT allowed Swets to choose TRT's counsel for purposes of the negotiation, and that Swets' chosen counsel, McDermott Will & Emery, acted on Swets' instructions during the negotiation and drafting of the MSA. *See* Dkt. 60 at 2. Those two facts, if true, may fairly be considered a manifestation of TRT's consent to be bound by Swets' conduct, at least as to the MSA.[4] DGI therefore, in an amended pleading, may be able to plead sufficient facts to show that Swets was at least a "special agent" for TRT, in that he was "an agent authorized to conduct a single transaction," rather than a "general agent."[5] *See* Restatement (Second) of Agency § 3.

When the principal is a corporation, it is presumptively liable for its agent's actions, and the agent's knowledge is presumptively imputed to the corporation, unless the agent acts outside the scope of his or her authority. *Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 465 (2010) ("Of

---

[4] The Court agrees with TRT that DGI's other proposed allegation, namely that "the parties effectively delegated to Swets the role of primary negotiator on behalf of and in the post-acquisition interests of TRT LeaseCo, as DGI's counterparty under the MSA," Dkt. 60 at 2, is conclusory and is need of more specific factual support. *See* Fed. R. Civ. P. 9(b).

[5] TRT seems to argue that, because Swets appeared to be in charge of the negotiation of the MSA, he cannot be considered to have been acting within TRT's control. *See* Dkt. 61 at 4. That argument misses the point because a principal can delegate as much authority or exercise as little control as it desires—it nevertheless remains in control if it has the ability to rescind that authority and overrule the agent's decisions, should it choose to do so. *See Cleveland v. Caplaw Enterprises*, 448 F.3d 518, 522 (2d Cir. 2006) ("[T]he control asserted need not 'include control at every moment; its exercise may be very attenuated and, as where the principal is physically absent, may be ineffective.'" (quoting Restatement (Second) of Agency § 14 cmt. a)). In this case, if Swets' terms were disagreeable to TRT and to CMC or CRIC, its parents, then CMC or CRIC could have negated any deal that Swets proposed, or terminated the agency relationship. To the extent that TRT is arguing that Swets was serving a different master, Kingsway, during the negotiations, that argument is better evaluated under the adverse interest exception, as discussed below.

particular importance is a fundamental principle that has informed the law of agency and corporations for centuries; namely, the acts of agents, and the knowledge they acquire while acting within the scope of their authority are presumptively imputed to their principals.") (collecting cases). Because a corporation, by nature, can act solely through its officers or other authorized agents, it "must, therefore, be responsible for the acts of its authorized agents even if particular acts were unauthorized." *Id.* That general rule holds true "even where the agent acts less than admirably, exhibits poor business judgment, or commits fraud." *Id.* Indeed, "it is a legal presumption that governs in every case, except where the [principal] corporation is actually the agent's intended victim." *Id.* at 466.

Because TRT authorized Swets to negotiate the MSA, TRT is presumptively liable for Swets' conduct related to that transaction. The Court acknowledges that Swets, when misrepresenting CMC's ability to use Kingsway's NOLs, was arguably doing so, at least in large part, for the benefit of Kingsway. Nevertheless, the law of agency is also clear on this issue. For a corporate agent to act beyond the scope of his employment, "the agent must . . . *totally abandon*[] his principal's interests and [act] *entirely* for his own or another's purposes." *Id.* (emphasis in original). In other words, the so-called "adverse interest exception" "cannot be invoked merely because [the agent] has a conflict of interest or because he is not acting primarily for his principal." *Id.* (citation omitted). In this case, Swets' misrepresentations likely played a role in inducing DGI to transfer equity in CMC to Kingsway and diverting DGI's would-be fees to Kingsway—but, drawing all reasonable inferences in DGI's favor, Swets also allegedly induced DGI to accept the MSA, which, by its terms, entitles TRT to various benefits, including indemnification and asset management services. *See* MSA (Dkt. 44-3) § 2. Thus, Swets, notwithstanding his unorthodox role, may not have entirely abandoned TRT's interests,

particularly when Kingsway's expected gain was also tied to TRT's fortunes. As such, TRT is presumptively liable for Swets' conduct in relation to the negotiation of the MSA—TRT has not cited any reason to overcome this presumption, and the Court does not see any on the face of the proposed pleading.[6]

Even if DGI cannot plausibly allege that Swets acted within the scope of his authority when he allegedly defrauded DGI, TRT could still be held responsible if, having "knowledge of all that ha[d] been done," it accepted the benefits of the MSA, which was procured by the fraud. *See Baldwin v. Burrows*, 47 N.Y. 199, 215–16 (1872). A principal becomes responsible for an agent's fraud if it has knowledge at the time the benefit was accepted, even if it "did not know[,] at the time of the transaction[,] the circumstances under which" the benefits were obtained. *See Rocky River Dev. Co. v. German-Am. Brewing Co.*, 193 A.D. 197, 202 (4th Dep't 1920). Thus, DGI may also be able to premise a fraudulent inducement claim on a ratification theory, if it can plead facts showing that TRT, knowing that Swets procured the deal by misleading DGI as to Kingsway's true intentions, accepted the benefits of the MSA and then failed to make restitution when it learned of the fraud. *See Elwell*, 31 N.Y. at 619–20 ("If an agent defrauds the person with whom he is dealing, the principal, not having authorized or participated in the wrong, may, no doubt, rescind, when he discovers the fraud, on the terms of making complete restitution. But

---

[6] The New York Court of Appeal's rationale in *Kirschner* also forecloses any argument that TRT did not specifically authorize Swets to make the misrepresentations pertaining the NOLs. *See* 15 N.Y.3d at 465. The scope of an agent's authority must be assessed in terms of the overall transaction, not in terms of specific acts taken in relation to that transaction. *See also* Restatement (Second) of Agency § 7 ("Authority is the power of the agent to affect the legal relations of the principal by acts done in accordance with the principal's manifestations of consent to him."). Indeed, a misrepresentation is considered "authorized" by the principal if the principal would have authorized the statement had it been true. *See* Restatement (Second) of Agency § 257 cmt. a) ("If the statement is one which, if true, the agent would be authorized or apparently authorized to make, the principal is subject to liability for it, although deceitfully made."); *see also* Restatement (Second) of Agency § 162 cmt. b ("If the agent is authorized to make representations concerning a certain matter, [] the principal is responsible for them if untrue statements are made."). Here, if it were true that Kingsway did not expect compensation for use of the NOLs, then there is no doubt that TRT would have allowed Swets to make such a representation to DGI in order to complete the transaction.

so long as he retains the benefits of the dealing, he cannot claim immunity on the ground that the fraud was committed by his agent and not by himself."). Because the Court has found that DGI has adequately alleged a theory under which Swets was acting within the scope of his employment, the Court declines to decide whether DGI's proposed pleading adequately supports a ratification theory.

## CONCLUSION

For the foregoing reasons, DGI's motion for leave to file an amended complaint to add a fraudulent inducement claim is GRANTED, to the extent that DGI can allege in the amended pleading additional specific facts, including but not limited to those cited in its letter brief, Dkt. 60 at 2, supporting a plausible inference that TRT authorized Swets to act as TRT's agent in relation to the negotiation of the MSA, or that TRT accepted the benefits of the MSA with full knowledge of Swets' alleged fraud. The amended complaint must be filed no later than **November 15, 2019**. The deadlines for the submission of a "joint pretrial order, with pre-marked trial exhibits, proposed findings of fact, and proposed conclusions of law," Dkt. 57, and any memoranda of law are adjourned pending further order. The bench trial currently scheduled for December 16, 2019, is also adjourned pending further order. The parties are directed to propose, no later than **November 22, 2019**, a new schedule for filing an answer to DGI's amended complaint and the parties' pre-trial submissions, as well as a new date for a bench trial to take place in February of 2020.

The Clerk of Court is respectfully requested to terminate docket entries 42 and 62.

**SO ORDERED.**

Date: **November 6, 2019**
**New York, New York**

_____
**VALERIE CAPRONI
United States District Judge**