USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 4/9/2021

## SETTLEMENT AGREEMENT AND MUTUAL RELEASES

This Settlement Agreement (this "Agreement") is made by and among DGI-BNSF Corp.

("DGI"), CRIC TRT Acquisition, LLC ("CRIC"), and BNSF-Delpres Investments LTD

("Delpres") on the one hand (the "CRIC Entities"), and TRT LeaseCo, LLC ("TRT"), Texas Rail

Terminal, LLC ("Texas Rail"), CMC Industries, Inc. ("CMC Industries"), CMC Acquisition,

LLC ("CMCA"), and Kingsway Financial Services Inc. ("KFS") on the other hand (the "KFS

Entities"), and is effective as of March 23, 2021 (the "Effective Date"). The signatories to this

Agreement will sometimes hereafter be referred to singularly as a "Party" and jointly as the

"Parties." This Agreement is made as a compromise among the Parties for the complete and final

settlement of existing claims and causes of action between the CRIC Entities and affiliates, on

the one hand, and KFS and affiliates on the other.

**WHEREAS,** DGI and TRT are parties to litigation in the United States District Court for

the Southern District of New York captioned *DGI-BNSF Corp. v. TRT LeaseCo, LLC*, Civil

Action No. 18-cv-3252-VEC (the "DGI Action"), in which DGI has asserted claims against TRT

and a bench trial has been held;

**WHEREAS,** DGI and TRT are parties to an action in the United States District Court for

the Southern District of New York captioned *TRT LeaseCo, LLC v. DGI-BNSF Corp.*, Civil

Action No. 20-cv-5257-VEC (the "TRT Action"), in which TRT has asserted claims against

DGI; and

**WHEREAS**, CRIC, Delpres, TRT, Texas Rail, CMC Industries and CMCA were parties

to litigation in the United States District Court for the Southern District of New York captioned

*CMC Acquisition LLC, et al. v. CRIC TRT Acquisition, LLC, et al.*, Case No. 18-cv-209-JMF

(the "CMCA Action"), in which TRT, Texas Rail, CMC Industries and CMCA had asserted

claims against CRIC and Delpres, and CRIC had asserted counterclaims against CMCA directly and derivatively on behalf of CMC Industries, and the parties agreed to dismiss their claims and counterclaims without prejudice pending the resolution of the DGI Action, as set forth more specifically in a stipulation filed in the CMCA Action; and

**WHEREAS,** the Parties desire to avoid the expense, inconvenience, and uncertainty of further litigation among them, and to resolve and settle all claims and disputes among them, whether known or unknown;

**NOW, THEREFORE**, for and in consideration of the mutual covenants, conditions, releases and promises contained herein, and for other good and valuable consideration exchanged between the Parties, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

**Section 1.  Settlement Terms.**

1.1    Upon execution of this Settlement Agreement, CMCA shall receive $1,500,000 out of the funds in the Wells Fargo Bank Northwest, N.A. Trust Account No. 84074600 (the "Escrow Account").  CRIC, CMCA and their affiliates shall give instructions, as necessary, to the escrow agent to distribute such funds.

1.2    Remaining funds in the Escrow Account that resulted from the increased monthly payments under the prior lease amendment with BNSF Railway Company (f/k/a The Burlington Northern and Santa Fe Railway Company) ("Tenant") shall be distributed immediately as follows:  eighty percent to DGI in the form of a fee; and twenty percent to CMCA.  CRIC, CMCA and their affiliates shall give instructions, as necessary, to the escrow agent to distribute such funds.

1.3     On a monthly basis for the duration of the initial lease term, funds that accumulate beyond current Permissible Expenses (as defined in Paragraph 1.6) in the Escrow Account because of the increased monthly payments under the prior lease amendment with the Tenant shall be paid (or, in the case of CMCA, distributed) as follows:  eighty percent to DGI as a fee and twenty percent to CMCA.   CRIC, CMCA and their affiliates shall give instructions, as necessary, to the escrow agent to pay or distribute such funds.

1.4     The Parties acknowledge and agree that the prior lease amendment with the Tenant resulted in an obligation on the Tenant to pay an additional approximately $25 million to TRT during the initial lease term.  The Parties further acknowledge and agree that after CMCA receives the $1,500,000.00 set forth in Paragraph 1.1, DGI shall receive a total of approximately $18.8 million under Paragraphs 1.2 and 1.3 above from such additional lease payments subject to any pro-rata share of Permissible Expenses paid by TRT under Paragraph 1.6 (for clarity, mortgage expenses, including principal and interest payments, will not reduce the fee to DGI), and all or part of a fee in the form of eighty percent of the proceeds of a monetization under Paragraph 1.7 in the event of such monetization.   The fee payments (or distributions) set forth in this Paragraph, Paragraphs 1.1 through 1.3 and Paragraph 1.7 are referred to herein as the "Front End Split."

1.5     Within three business days of receipt of the payments in Paragraphs 1.1 and 1.2 above, the Parties shall file and cause to be filed a Stipulation of Dismissal with Prejudice in customary form in the DGI Action and the TRT Action, and the Parties shall treat the CMCA Action as dismissed with prejudice.

1.6     Payments and distributions of the Front End Split amounts to DGI and CMCA shall not be subject to the operation of the "Contribution and Liability Satisfaction Amount" or

the "Threshold Amount," as those terms are used in the Management Services Agreement between TRT, DGI and others dated July 14, 2016 ("MSA").  Payments and distributions of the Front End Split amounts shall not be reduced by any payment obligation or expense that any of the KFS Entities or affiliates impose or seek to impose upon CMC Industries or TRT or any of their subsidiaries (whether under a tax allocation agreement, practices or otherwise) for the use of net operating losses or tax benefits from net operating losses. Separate and apart from monthly mortgage expenses, including principal and interest payments, paid to the lender from the Escrow Account, "Permissible Expenses" that TRT can pay before the distribution or payment of the Front End Split shall consist only of necessary and reasonable unaffiliated third-party obligations or expenses that are actually and then-currently due and owed by CMC Industries, Texas Rail or TRT and paid, including those owed by CMC Industries, Texas Rail or TRT and paid by them or on their behalf to state and local taxing authorities or to unaffiliated accountants for the respective and customary share of costs for the preparation of tax returns, but shall not include federal income taxes. To the extent that net operating losses are not available to offset net income of CMC Industries, Texas Rail or TRT, any resulting federal income tax liability actually imposed on or paid by or on behalf of CMC Industries, Texas Rail or TRT on their net income for periods commencing July 15, 2016 or thereafter shall be paid out of the twenty percent distribution under the Front End Split to CMCA or its assignees.  To the extent that any KFS Entity pays additional such amounts to taxing authorities beyond CMCA's twenty percent distribution under the Front End Split, such KFS Entity shall have a priority right to be reimbursed or repaid such amounts out of proceeds of any sale, exit or lease extension giving rise to the Back End Split defined in Paragraph 1.9 (but reimbursed only to the extent that such payments have not been effectively returned, reimbursed or the like by the taxing authority).  For

4

clarification, the payments to which DGI is entitled under Paragraphs 1.2 and 1.3 shall not be

reduced because of the use of net operating losses or tax benefits from net operating losses held

by any of the KFS Entities and/or their affiliates, whether under a tax allocation agreement,

practices or otherwise. This Agreement shall also operate to modify the "Certain Rights"

provision found in Article 15 of the Stockholders' Agreement dated July 14, 2016 (the

"Stockholders' Agreement") so that the phrase "a price equal to (x) 50% of the Contribution and

Liability Satisfaction Amount (as defined in the MSA) as of the closing date of such purchase

(provided that the amount set forth in this clause (x) shall not exceed 10,000,000)" shall be

amended to state a "price equal to (1) 90% of actual, necessary, reasonable and otherwise

unreimbursed out-of-pocket expenses paid to third parties, including actual payments required by

and made to any taxing authorities by any of the KFS Entities arising from net income of CMC

Industries, TRT or any of their subsidiaries, but not including legal expenses incurred or paid by

the KFS Entities in connection with the operation of CMC Industries, TRT or any of their

subsidiaries, capped at $9,000,000."  To the extent that TRT or CMCA breaches obligations and

fails to cure so that DGI or CRIC accrue rights under Article 15 of the Stockholders Agreement

then DGI and CRIC shall have the right to remedy such deficiencies and, in the absence of CRIC

exercising its right to buyout CMCA under Article 15, DGI and CRIC shall have a priority right

to be reimbursed the amount paid to cure such breaches from the "Back End Split" as defined in

Paragraph 1.9, before CMCA or its assignee receives any payment or distribution owed to it

under Paragraph 1.9.   As a supplement to existing rights under Article 15 of the Stockholders

Agreement, if CMCA's twenty percent share of the Front End Split is insufficient to pay federal

income taxes for the periods described above and KFS and CMCA do not pay such federal taxes,

as a result of which TRT or CMC Industries is required to use material funds for such federal

income taxes that otherwise would have been paid to DGI under the Front End Split, and DGI is

not promptly reimbursed by the KFS Entities on written demand consistent with the timing

provisions under Article 15, TRT shall be deemed to owe such amounts to DGI as immediately

payable, and CRIC shall be entitled to exercise its right to buy out CMCA under Article 15 based

on the pricing set forth above in this Paragraph 1.6.

   1.7  The KFS Entities, including but not limited to TRT, hereby authorize DGI to take

steps needed to monetize on commercially reasonable terms that portion of the increase in

payments from the Tenant under the prior lease amendment within the Front End Split that

would still cause to remain in escrow $75,000 in receipts per year to cover franchise taxes and

other third-party expenses, and DGI shall have the right but not the obligation to take the lead in

the process of such monetization.  Prior to closing the monetization, DGI shall present its terms

to the KFS Entities, which shall not unreasonably withhold approval, and shall ensure their

Board appointees do not withhold approval, of such commercially reasonable monetization

opportunities that DGI presents so long as (i) such transaction is an entirely arms' length

transaction; and (ii) the terms of the transaction do not materially benefit DGI or CRIC

differently than they benefit the KFS Entities other than the difference in their respective

percentage shares of the Front End Split. The Parties acknowledge and agree that a customary

term that provides the lender with reasonable opportunities to object to the terms of an early sale

or the inclusion of a commercially reasonable prepayment penalty (to be paid by TRT out of

proceeds from the sale that creates the Back End Split) shall not be deemed unreasonable terms

of monetization.  DGI shall be entitled to select counsel for TRT in connection with the

monetization.  Any necessary and commercially reasonable lender fees, legal fees, or other

necessary and commercially reasonable third-party expenses incurred by TRT in connection with

monetization shall be paid by TRT, and all such expenses shall be paid out of the Front End Split, such that eighty percent of these expenses reduce the economic benefits otherwise enjoyed by DGI and twenty percent of these expenses reduce the economic benefits otherwise enjoyed by CMCA.  The proceeds from monetization, after the payment of such monetization expenses, shall be paid (or distributed in the case of CMCA) at closing as follows: eighty percent to DGI in the form of a fee and twenty percent to CMCA.  CRIC, CMCA and their affiliates shall give irrevocable instructions, as necessary, to the escrow agent to pay or distribute such funds.  The Parties agree that any breach of this Paragraph 1.7 by any of the KFS Entities causes irreparable harm to DGI, which shall be entitled to specific performance of the obligations herein.  For clarification, the payments to which DGI is entitled under this Paragraph 1.7 shall not be reduced because of the use of net operating losses or tax benefits from net operating losses held by any of the KFS Entities and/or their affiliates, whether under a tax allocation agreement, practices or otherwise.

1.8     The KFS Entities consent to Terracap Management, Inc. ("Terracap") serving as a guarantor or indemnitor if required by the lender to consummate such monetization, and to Terracap charging TRT a one percent per annum guarantee fee for such necessary guarantee or indemnitor services (even if only partial or limited in scope) sufficient to support the new monetized amount and based upon the monetized amount. DGI shall also be entitled to charge TRT up to a one percent arrangement fee in the event of a completed monetization in accordance with the terms hereof, based only upon the amount at issue in the monetization, and based upon the net proceeds of the monetization. TRT agrees to pay DGI such arrangement charge and the guarantee fees at the closing of the monetization. These fees shall also be paid out of the Front End Split, such that eighty percent of these expenses reduce the economic benefits otherwise

enjoyed by DGI and twenty percent of these expenses reduce the economic benefits otherwise enjoyed by CMCA.

1.9     If the net proceeds from a sale of the property owned by, or stock in, CMC Industries or TRT, or proceeds from any sale or exit transaction are greater than or equal to $72,000,000.00 after both satisfying TRT's lenders, including any prepayment penalties whether in connection with the original loan or the monetization, and making any and all other necessary and actual payments of taxes, reasonable third-party fees, and expenses of sale (including, without limitation, unaffiliated brokers' fees and actual taxes owed or paid to any taxing authorities, but specifically excluding any amounts due to a Party hereunder), then at the closing, after TRT's payment of (i) any prepayment penalty whether in connection with the original loan or the monetization, and (ii) any reimbursement to DGI or CRIC owed under the last sentence of Paragraph 1.6, and (iii) satisfaction of the KFS Entities' priority right to reimbursement as described in Paragraph 1.6, CMCA or its assignee shall receive the first $40,000,000.00 of such proceeds in the form of a distribution of a preferred return, then CRIC shall receive the next $9,400,000 in a distribution, and DGI shall receive a Management Fee of $30,600,000 to the extent such proceeds remain, with any further remainder of such proceeds (if any) being distributed forty eight and six-tenths percent to CMCA in respect of its common shares, forty percent in the form of a Management Fee to DGI, and eleven and four-tenths percent in the form of distributions to CRIC in respect of its common shares.  If such total net proceeds are less than $72,000,000.00, then at the closing, the Parties shall split such proceeds fifty-five percent to CMCA in the form of a distribution of a preferred return, twelve and nine-tenths percent to CRIC as a distribution, and thirty two and one-tenth percent to DGI in the form of a Management Fee. Proceeds from any lease renewals or new leases shall be treated as additional proceeds from an

ultimate sale to be distributed as part of the Back End Split.  Payments and distributions of the

Back End Split amounts to DGI, CRIC and CMCA shall not be subject to the operation of the

"Contribution and Liability Satisfaction Amount" or the "Threshold Amount," as those terms are

used in the MSA.   Payments and distribution of the Back End Split amounts shall not be reduced

by any payment obligation or expense that any of the KFS Entities or affiliates impose or seek to

impose upon CMC Industries or TRT or any of their subsidiaries (whether under a tax allocation

agreement, practices or otherwise) for the use of net operating losses or tax benefits from net

operating losses.  Payments or distributions from the Back End Split shall be made (a) at the

closing of sale or other exit and (b) upon receipt of rental income from an applicable lease

renewal, and if needed, CRIC, DGI, CMCA and their affiliates shall give instructions, as

necessary, to any pertinent escrow or title agent to pay and distribute such funds according to the

terms of this Agreement.  This Paragraph 1.9 shall operate to modify the Stockholders

Agreement, Stock Purchase Agreement dated May 17, 2016 (the "SPA"), and MSA as necessary

to implement the terms in this Paragraph 1.9, and the parties agree to amend the CMC Industries

charter or by-laws to the extent and only to the extent necessary to implement these terms. The

payments or distributions described in this Paragraph 1.9 are referred to herein as the "Back End

Split."  For clarification, the payments or distributions to which DGI or CRIC are entitled under

this Paragraph 1.9 shall not be reduced because of the use of net operating losses or tax benefits

from net operating losses held by any of the KFS Entities and/or their affiliates, whether under a

tax allocation agreement, practices or otherwise. The Parties agree that any breach of this

Paragraph 1.9 by any of the Parties that interferes with rights under this Paragraph of another

Party, causes irreparable harm entitling the aggrieved Party to specific performance of the

obligations herein.

1.10     To the extent there is any conflict in amounts payable to DGI under this

Agreement and the MSA, this Agreement controls. The Front End Split, the arrangement and

guaranty fees described herein and the Back End Split are intended to constitute full

compensation for DGI and Terracap under the MSA and this Agreement. Aside from the Front

End Split, the arrangement and guaranty fees described herein, and the Back End Split, no

further compensation or fees shall be payable to DGI or Terracap under the MSA or otherwise.

1.11     CMCA and KFS shall have the right to determine the timing and terms of any

such cash sale of the property owned by, or stock in, CMC Industries (including any equity or

stock sale of all or substantially all of CMC Industries) at any time after December 31, 2028,

provided that (i) such transaction is an entirely arms' length transaction, and (ii) the KFS entities

make best efforts to maximize the cash proceeds of such a sale for distribution in the Back End

Split, and (iii) the terms of the transaction do not operate to reduce, reverse or undermine any of

the economic benefits contemplated for DGI or CRIC under this Agreement (including the Front

End Split or the Back End Split) or any other agreement among the Parties except as expressly

modified herein.  DGI and CRIC shall also have the right to present sale and exit opportunities to

CMCA and KFS, which shall consider such opportunities in good faith so long as those

opportunities meet the conditions identified in items (i) and (iii) above (with the KFS Entities

substituted for DGI and its affiliates and vice-versa), and consideration of any such opportunity

will not preclude the timely closing of a transaction negotiated by CMCA or KFS that meets (i),

(ii) and (iii) above. To the extent KFS completes a sale or other exit before the end of the initial

lease term, and in the event that there has not been full payments and distributions from the

monetization in accordance with the terms hereof, DGI and CMCA shall remain entitled to any

remainder of the Front End Split that the respective Party would have received had the lease

continued to expiration, as a priority before CMCA or KFS receives any of the Back End Split. Upon any sale or other exit, DGI shall be entitled to retain any proceeds from a monetization under Paragraph 1.7 without any reduction, right of setoff or credit for such share of proceeds when making payments or distributions pursuant to the Back End Split.  If the KFS Entities do not complete a sale or other exit before the end of the initial lease term, the KFS Entities shall make reasonable efforts to promptly complete such a sale or other exit and shall make reasonable efforts to maximize the cash proceeds of such a sale or exit for distribution in the Back End Split.

  1.12 TRT, Texas Rail and CMC Industries shall continue to pay ongoing third-party operating expenses incurred in the normal course of business out of the ongoing lease proceeds, including, without limitation, customary and necessary registered agent fees, annual report (or similar) filing fees, and state and local taxes, fees and assessments (including, without limitation, state income taxes, gross receipts taxes, and franchise taxes, but specifically excluding taxes required to be paid by BNSF Railway Company).  If a monetization has not taken place under paragraph 1.7, TRT shall be entitled to retain in the Escrow Account funds sufficient to pay the next annual franchise tax obligation.  If and when monetization occurs, the amount so monetized shall preserve $75,000 per year of ongoing lease payments in the Escrow Account to cover franchise taxes and other third-party expenses through the initial lease term.  To the extent that any of the KFS Entities, DGI, or CRIC has advanced any other actual, necessary and customary third-party expenses for TRT during the lease term, excluding (i) any payments out of CMCA's twenty percent share of the Front End Split to pay federal income taxes as described in Paragraph 1.6, and (ii) legal fees and costs unless approved in writing by CRIC during the lease term and not received reimbursement for that amount, subject to Paragraph 1.6, such entity shall be entitled to reimbursement from the proceeds of the sale or exit.

1.13     Except as modified or contemplated herein, all other terms of the Parties'
Stockholders' Agreement, the SPA and MSA shall remain in full force and effect.

1.14     DGI, CRIC, Delpres and their affiliates shall bear their own legal expenses related
to the DGI Action, the TRT Action, the CMCA Action, settlement negotiations and negotiation
of this Agreement. KFS and CMCA shall bear their own legal expenses and all legal expenses of
CMC Industries, Texas Rail, and TRT LeaseCo related to the DGI Action, the TRT Action, the
CMCA Action, settlement negotiations and negotiation of this Agreement.

**Section 2.  <u>Compromise</u>.**

2.1     The Parties agree and acknowledge that this Agreement is the result of a
compromise and shall not be construed as an admission of any liability, wrongdoing, or
responsibility on their parts or on the parts of any Party or their predecessors, successors, assigns,
agents, parents, subsidiaries, affiliates, directors, officers, employees, principals, or partners.

**Section 3.  <u>Releases</u>.**

3.1     Upon receipt of the payment set forth in Paragraph 1.2, except for the obligations
set forth or reaffirmed in this Agreement, each of DGI, Terracap, CRIC and Delpres, for
themselves and their successors, assigns, corporate parents, subsidiaries, divisions, commonly
controlled entities, receivers, predecessors, and any entity in privity with DGI, Terracap, CRIC
or Delpres (collectively the "DGI Releasors") releases and forever discharges each of KFS,
CMCA, CMC Industries, Texas Rail, TRT LeaseCo and their predecessors, successors, assigns,
corporate parents, subsidiaries, directors, owners, officers, employees, principals, members,
partners, investors, insurers, sureties, representatives, agents, and attorneys (the "CMCA
Released Parties") from and against all actions, causes of action, claims, suits, debts, damages,
judgments, liabilities, claims for attorneys' fees, punitive damages, interest, costs, obligations,

demands, and all other legal or equitable responsibilities of any form whatsoever, whether now known or unknown, suspected or unsuspected, fixed or contingent, liquidated or unliquidated, based in law or equity, that the DGI Releasors have or may have had at any time prior to and including the Effective Date, including, without limitation, the claims arising under any theory of law, whether common, constitutional, contractual, statutory, based in tort, or any other source of any jurisdiction, foreign or domestic, in which the DGI Releasors had, has, or may claim to have arising out of and/or related in any way to the claims that were asserted or could have been asserted in the DGI Action, the TRT Action, or the CMCA Action and/or the incidents made the basis of the DGI Action, the TRT Action, or the CMCA Action, occurring contemporaneously with or prior to the Effective Date of this Agreement. Nothing in this release shall operate to affect the Parties' rights or obligations under the Stockholders' Agreement, the SPA or MSA on a going forward basis except as expressly set forth or contemplated herein.

      3.2    Upon receipt of the payment set forth in Paragraph 1.1, except for the obligations set forth or reaffirmed in this Agreement, each of KFS, CMCA, CMC Industries, Texas Rail and TRT, for themselves and their successors, assigns, corporate parents, subsidiaries, divisions, commonly controlled entities, receivers, predecessors and any entity in privity with, CMCA, CMC Industries, Texas Rail and TRT (collectively the "CMCA Releasors") releases and forever discharges each of DGI, Terracap, CRIC and Delpres, and their respective predecessors, successors, assigns, corporate parents, subsidiaries, directors, owners, officers, employees, principals, members, partners, investors, insurers, sureties, representatives, agents, and attorneys (the "DGI Released Parties") from and against all actions, causes of action, claims, suits, debts, damages, judgments, liabilities, claims for attorneys' fees, punitive damages, interest, costs, obligations, demands, and all other legal or equitable responsibilities of any form whatsoever,

whether now known or unknown, suspected or unsuspected, fixed or contingent, liquidated or unliquidated, based in law or equity, that the CMCA Releasors have or may have had at any time prior to and including the Effective Date, including, without limitation, the claims arising under any theory of law, whether common, constitutional, contractual, statutory, based in tort, or any other source of any jurisdiction, foreign or domestic, in which the CMCA Releasors had, has, or may claim to have arising out of and/or related in any way to the claims that were asserted or could have been asserted in the DGI Action, the TRT Action, or the CMCA Action and/or the incidents made the basis of the DGI Action or TRT Action, or the CMCA Action,  occurring contemporaneously with or prior to the Effective Date of this Agreement. Nothing in this release shall operate to affect the Parties' rights or obligations under the Stockholders' Agreement, the SPA or MSA on a going forward basis except as expressly set forth or contemplated herein.

3.3     The Parties acknowledge that they may discover facts or law different from, or in addition to, the facts or law that they know or believe to be true with respect to the matters released in this Agreement and agree nonetheless, that this Agreement and the releases contained in it shall be and remain effective in all respects, notwithstanding such different or additional facts or law or the discovery of them.  The Parties declare and represent that they intend this Agreement to be complete and not subject to any claim of mistake, fraud or duress, and that the releases in this Agreement express full and complete releases of existing claims, known or unknown.

3.4     The Parties represent that they have not assigned any claims, issues, or causes of action, or any part thereof, being released in this Agreement.

**Section 4.  <u>Miscellaneous</u>.**

4.1     This Agreement may be executed in identical counterparts, each of which shall constitute an original and all of which shall constitute one and the same Agreement.

4.2     This Agreement may be modified only by a written document signed by the Parties. No waiver of this Agreement or any of the promises, obligations, terms, or conditions hereof shall be valid unless it is written and signed by the Party against whom the waiver is to be enforced.

4.3     This Agreement shall be binding upon the Parties hereto, their assigns, predecessors, and successors. Each of the signatories of this Agreement represents and warrants that he or she is authorized to execute this Agreement and to bind the Party on whose behalf he or she signs.

4.4     Each of the Parties represents that the person executing this Agreement is duly authorized by the Party to execute and deliver this Agreement on its behalf, and each of the Parties shall be estopped hereafter to deny the genuineness of the signatures of the signatories hereof or their authority to execute and deliver this Agreement.

4.5     Each Party represents that this Agreement is the product of negotiations among the Parties. All Parties acting through themselves or their attorneys have participated in the drafting of this Agreement. Therefore, no Party to this Agreement shall be charged with having promulgated this Agreement or have this document construed for or against a Party under the rules of contract construction.

4.6     Each Party represents and acknowledges that in executing this Agreement it has not relied and does not rely upon any representation or promise not contained or referred to in this Agreement.

4.7     This Agreement and any claim, controversy or dispute arising out of or related to this Agreement, any of the transactions contemplated hereby, the relationship of the parties, and/or the interpretation and enforcement of the rights and duties of the parties, whether arising in contract, tort, equity or otherwise, shall be governed by and construed in accordance with the domestic laws of the State of New York (including in respect of the statute of limitations or other limitations period applicable to any such claim, controversy or dispute), without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York. EACH OF THE PARTIES WAIVES ITS RESPECTIVE RIGHTS TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OR RELATED TO THIS AGREEMENT IN ANY ACTION, PROCEEDING OR OTHER LITIGATION OF ANY TYPE BROUGHT BY ANY OF THE PARTIES AGAINST ANY OTHER PARTY OR ANY AFFILIATE OF ANY OTHER SUCH PARTY, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS OR OTHERWISE. THE PARTIES AGREE THAT ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE TRIED BY A COURT TRIAL WITHOUT A JURY. WITHOUT LIMITING THE FOREGOING, THE PARTIES FURTHER AGREE THAT THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY IS WAIVED BY OPERATION OF THIS SECTION AS TO ANY ACTION, COUNTERCLAIM OR OTHER PROCEEDING WHICH SEEKS, IN WHOLE OR IN PART, TO CHALLENGE THE VALIDITY OR ENFORCEABILITY OF THIS AGREEMENT OR ANY PROVISION HEREOF. THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT.

4.8     THE PARTIES AGREE THAT ALL DISPUTES, LEGAL ACTIONS, SUITS AND PROCEEDINGS AMONG THEM ARISING OUT OF OR RELATING TO THIS AGREEMENT MUST BE BROUGHT EXCLUSIVELY IN THE STATE OR FEDERAL COURTS LOCATED IN THE SOUTHERN DISTRICT OF NEW YORK (COLLECTIVELY THE "DESIGNATED COURTS"). EACH PARTY (BUT ONLY SUCH PARTY AND NOT ANY INDIVIDUAL PRINCIPAL) HEREBY CONSENTS AND SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE DESIGNATED COURTS. EACH PARTY (BUT ONLY SUCH PARTY AND NOT ANY INDIVIDUAL PRINCIPAL) HEREBY IRREVOCABLY WAIVES ALL CLAIMS OF IMMUNITY FROM JURISDICTION AND ANY OBJECTION WHICH SUCH PARTY MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR PROCEEDING IN ANY DESIGNATED COURT, INCLUDING ANY RIGHT TO OBJECT ON THE BASIS THAT ANY DISPUTE, ACTION, SUIT OR PROCEEDING BROUGHT IN THE DESIGNATED COURTS HAS BEEN BROUGHT IN AN IMPROPER OR INCONVENIENT FORUM OR VENUE.  EACH OF THE PARTIES (BUT ONLY SUCH PARTY AND NOT ANY INDIVIDUAL PRINCIPAL) ALSO AGREES THAT DELIVERY OF ANY PROCESS, SUMMONS, NOTICE OR DOCUMENT TO A PARTY HEREOF IN COMPLIANCE WITH THIS AGREEMENT SHALL BE EFFECTIVE SERVICE OF PROCESS ON THAT PARTY FOR ANY ACTION, SUIT OR PROCEEDING IN A DESIGNATED COURT WITH RESPECT TO ANY MATTERS TO WHICH THE PARTIES HAVE SUBMITTED TO JURISDICTION AS SET FORTH ABOVE.

4.9     A photocopy, facsimile, or .pdf version of this Agreement and any and all signatures shall have the same lasting and binding effect as the original.

4.10    Neither this Agreement nor any rights under it is transferable to any other person or entity without the written consent of all Parties.

4.11    All Parties agree to execute or have their attorneys execute all additional documents and take all additional actions necessary to effectuate the intent of this Agreement.

DGI-BNSF Corp.

By: LARRY KRAUSS                                  Date: 0319/2021
Title: President


CRIC TRT Acquisition, LLC

By: LARRY KRAUSS                                  Date: 03/19/2021
Title: President


BNSF-Delpres Investments LTD

By: LARRY KRAUSS                                  Date: 03/19/2021
Title: President


TRT LeaseCo, LLC

By:                                               Date: 03/19/2021
Title:


Texas Rail Terminal, LLC

By:                                               Date: 03/19/2021
Title:
CMC Industries, Inc.

_____     Date:     /   /2021
By:
Title:


CRIC TRT Acquisition, LLC


_____     Date:     /   /2021
By:
Title:


BNSF-Delpres Investments LTD


_____     Date:     /   /2021
By:
Title:


TRT LeaseCo, LLC

_____     Date:   3 /22/2021
By:   John T. Fitzgerald
Title:   Authorized Signatory


Texas Rail Terminal, LLC

_____     Date:   3 /22/2021
By:   John T. Fitzgerald
Title:   Authorized Signatory
CMC Industries, Inc.


_____     Date:   3 /22/2021
By:   John T. Fitzgerald

Title:   Authorized Signatory

CMC Acquisition, LLC


By:   John T. Fitzgerald                Date:   3 / 22 / 2021
Title:   Authorized Signatory


Kingsway Financial Services Inc.


By:   John T. Fitzgerald                Date:   3 / 22 / 2021
Title:   President and CEO


The Court hereby retains enforcement jurisdiction over this settlement agreement.

SO ORDERED.

                              Date: April 9, 2021

HON. VALERIE CAPRONI
UNITED STATES DISTRICT JUDGE